Filed 3/1/24  P. v. Potts CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAMES EDWARD POTTS,<br><br>    Defendant and Appellant. | F085945<br><br>(Super. Ct. No. VCF041052D-98)<br><br><br>**OPINION** |

---

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Petitioner James Edward Potts petitioned the trial court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder (§ 187, subd. (a)). (*People v. Potts* (Oct. 19, 2022, F081141) [nonpub. opn.] (*Potts*).) The court conducted an evidentiary hearing (§ 1172.6, subd. (d)(3)) and denied the petition on the grounds petitioner was a major participant in the underlying felony who acted with reckless indifference to human life.

On appeal, petitioner contends substantial evidence does not support the trial court's findings. We affirm.

## FACTUAL BACKGROUND

Our factual summary is derived from evidence received in petitioner's trial, which was considered by the trial court when denying petitioner's section 1172.6 petition for resentencing.

### I. The Crime Scene and Investigation

On February 5, 1998, Byron Jennings did not arrive for a planned dinner with his long-time neighbor, Roger B.[2] The next morning, Roger attempted to call Jennings several times but received no response. Around noon, Roger went to Jennings's house.[3] He saw a newspaper in the driveway that had not been picked up and the door to

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

As will be described in further detail *post*, other persons involved in this incident and/or charged as codefendants are: Larry Ward, Randy Spohn, Daniel Blunt, William Moore, Joseph Young, Joshua Sommerset, and Christie Wise. These individuals are not parties in this appeal.

[3] The location where Roger and Jennings lived was "out in orange groves." Jennings was Roger's closest neighbor but lived one-quarter to one-half mile away.

2.

Jennings's office was open, which was not typical. Roger saw "blood everywhere," including on the doormat just inside the door, on the floor and carpet, and on a railing. A picture on the floor blocked the door from closing and there was "[l]ots of blood" on a chair. Further inside, next to a door leading to the living room, Roger saw a bloody handprint dragged down the wall near the burglar alarm system. Roger walked around the house and called for Jennings but received no response. Eventually, Roger called the Tulare County Sheriff's Office.

Sheriff's deputies responded to the scene and located a dark baseball cap in a flowerbed next to the porch, a white envelope next to the cap, and a pair of glasses in the driveway just outside the door.[4] There was blood surrounding a door at the side of the residence and indentations on the door and the wall next to it. The inside of the house was in disarray. The kitchen cabinets and drawers were pulled open. The door to the basement was open and there were drag marks coming up the stairs and across the kitchen floor. In the office, the deputy found "[l]arge amounts of blood." The carpet was saturated with blood and there was blood on the furniture and walls. The computer was on and an empty spool of what appeared to be duct tape was on the floor.[5] A rear bedroom appeared to have been ransacked. A ball bearing, small spring, small button, and a portion of a lock cylinder were collected from the living room floor. These were later determined to be consistent with components of the Club, a car anti-theft device. There was blood on the door jamb between the office and the living room and some blood on the living room wall. Upstairs, deputies found a blood smear on a light switch in a hallway and a small amount of blood on the door trim leading into Jennings's

---

[4] William Moore testified to owning a similar cap but denied being present at the scene or knowing how the cap got there.

[5] Information from Jennings's Internet service provider indicated his computer last connected to the Internet on February 5, 1998, at 4:53 p.m., and the connection was terminated at 7:12 p.m.

bedroom. A fingerprint analyst processed multiple latent impressions, smudges, smeared and fragmentary impressions from the scene that ultimately were of no value. Petitioner's fingerprints were not found at the residence. DNA taken from various locations in the home was consistent with that of Jennings.

Outside the house, the door to the "phone box" was open and the wires were pulled out and detached from each other. A piece of phone cord was on the ground near the phone box. A partial roll of duct tape and a plastic soda bottle with a hole in the cap were located on an exterior walkway that led to the office.

In a room adjacent to the unattached garage, deputies located 54 large marijuana plants with a drip line and overhead "grow lights." Sixty marijuana seedlings were located in the basement. It appeared the marijuana was being cultivated for sale.

Eventually, deputies walked into Jennings's orange groves, where they located Jennings's body, approximately six rows away from the driveway. He was not wearing shoes and his socks were muddy as if he had walked there. Jennings's body was face down with a blanket next to it, to which some duct tape was adhered. A Beretta .25-caliber revolver belonging to Jennings was located within two to three feet of the body. The firearm had a loaded clip and a round in the cylinder.

Jennings's body had multiple blunt trauma lacerations, bruises, and abrasions, including on the forehead, left jaw region, chin, neck, and back of the head. He had approximately 14 distinct blunt trauma lacerations to the head representing approximately 11 separate blows and approximately 18 total injuries on the rest of his body. Some circular or "curv[i]linear" marks on the body appeared as if "an instrument had been pressed in that area of the skin, leaving an actual imprint." Circular wound patterns on his body were consistent with the cylinder on the Club. Many of the head lacerations were deep and extended down to the level of the bone. Internally, one skull fracture corresponded to a large irregular laceration on the back of the head and another corresponded to a linear laceration on the forehead. There was diffused hemorrhaging

4.

spread over the surface of the brain. Jennings had multiple bruises and abrasions, including on his right ankle, foot and anterior leg, his posterior right arm and elbow, and the backs of his hands. The cause of death was determined to be diffuse subarachnoid hemorrhage due to multiple skull fractures due to multiple blunt traumas to the head. A forensic pathologist estimated Jennings could have lived for minutes or up to a half hour or so after suffering his head injuries, but acknowledged it is very difficult to predict how long someone will live as a result of such injuries.

## II. Further Investigation

Jennings's credit cards were used more than 50 times after February 5, 1998, at locations that included a gas station, a casino, and several retail stores.

On February 12, 1998, sheriff's deputies retrieved videotape and photographs showing five subjects using Jennings's credit card at a casino. Separate video appeared to show five individuals arriving in Larry Ward's white Oldsmobile. One video showed two individuals, one of whom was later identified as Ward, entering the casino. Approximately two or three minutes later, video showed three other individuals, one of whom was later identified as Moore, entering the casino. At the casino, Moore used Jennings's credit card at a restaurant and unsuccessfully attempted to obtain cash.

On February 14, 1998, deputies searched Ward's house and found in his room various items that were recently purchased, including stereo equipment and packaging for shoes and socks. They also found items identified as having been taken from Jennings's residence, including a Maltese cross with gold leaf and two plastic coin holders containing silver quarters and pennies. On the same date, deputies seized Ward's Oldsmobile and recovered from the trunk the "slider section" of a Club. Wire cutters and duct tape were found in the trunk. Ward's fingerprint was found on the duct tape.

On March 11, 1998, a sheriff's dive team located a safe and its detached door on the Tule River. Based on the serial number, model number, and combination, deputies were able to identify the safe as belonging to Jennings.

5.

On March 25, 1998, deputies located many items at the homes of Joseph Young and Joshua Sommerset that were identified or suspected as having been taking from Jennings's residence. These items included a Zippo lighter with the initials MLJ, a gold lighter with the initials CEN,[6] several two-dollar bills, and a 1957 one-dollar silver certificate.

On April 17, 1998, officers searched a location where they believed the murder weapon had been tossed from a vehicle, approximately seven miles from the murder scene. They located portions of a generic Club device with an empty hole where the locking cylinder components had fallen out. The "slider," i.e., the part of the device that locks in between a steering wheel, was missing. Half of the shear pin was still on the Club. The other half of the shear pin was in the cylinder found in Jennings's house.

None of Jennings's property was found with petitioner. There was no evidence that petitioner ever used Jennings's credit cards.

## III. Petitioner's Prior Relationship with Jennings

Petitioner and Jennings grew up together. Petitioner also was known to the residents in Jennings's neighborhood. Roger described him as someone who "always seemed like a person who needed some help." Petitioner worked for Jennings sometime between 1989 and 1993 but was fired. From 1993 or 1994 to 1995, Roger's relationship with Jennings was distrustful, and petitioner began to ask Roger about Jennings's safe. Petitioner asked about the safe at least a dozen times. At one point, petitioner asked whether he could crawl under the house and get the safe. On another occasion he asked if Roger could get the code for the burglar alarm. And, on another occasion he asked if there was a key for the door going to the basement where the safe was located. Each time, Roger told Jennings about petitioner's interest in the safe, but Jennings considered

---

[6] "MLJ" are Jennings's son's initials, and the lighter came from his bedroom. "CEN" are Jennings's grandfather's initials.

petitioner's comments to be a joke. Jennings laughed and made comments such as, "Yes, us farmers all keep our wealth in the safe." After 1995, petitioner stopped coming around and Roger had no further discussions with him regarding the safe.

## IV. Randy Spohn's Testimony

Randy Spohn testified at trial pursuant to a plea agreement in which he pled guilty to second degree murder and robbery. Spohn also gave two prior recorded statements to law enforcement. His first statement, given on March 28, 1998, while he was in custody in Arkansas, was inconsistent with his trial testimony in various ways described below.

Spohn testified that he spent part of the morning of February 5, 1998, with Ward before they parted ways around noon or 1:00 p.m. At that time, Ward told Spohn he might be back and might need Spohn for something.

Ward returned to Spohn's house at 4:00 or 5:00 p.m. that evening. Ward asked Spohn to go with him to a house in Strathmore to help him collect some money as payment for methamphetamine Ward had delivered the day prior. Spohn agreed to go along but Ward could not recall how to get to the house. As such, they drove around looking for petitioner, who was at that time unknown to Spohn. They eventually received information that petitioner was at a local bar. Ward went into the bar to talk with petitioner while Spohn waited in the car. After about 15 minutes, Ward returned with petitioner and Daniel Blunt, who also was previously unknown to Spohn. Ward got back into his car with Spohn while petitioner and Blunt got into a separate truck. Ward followed the truck to a house where petitioner and Blunt dropped off the truck.

Spohn testified the following conversation took place in front of the house: "[Ward] told [petitioner], 'Well, you ready to go do this?' And he said yes and he said okay, and asked him who I was. [Ward] said, 'Well, he's with me,' [petitioner] said, 'We'll need him, he's going to know me.' And he said okay." Ward and petitioner also discussed collecting money. Petitioner got into the rear driver's side seat and Blunt got into the rear passenger side seat of Ward's car. All four men had used methamphetamine

7.

that day.  To Spohn's knowledge, none of them were in possession of any guns, knives, or other weapons.

They stopped briefly at a store, from which petitioner directed them to Jennings's house.  Ward pulled "head in" into Jennings's driveway to just before the porch.  He put the car in park but left it running and with the lights on when he got out.  Spohn, Blunt, and petitioner remained in the car.  Ward went up the front steps and Jennings opened the door and stood in the door frame.  They talked for a few minutes before Ward came back, turned off the car, took the keys, and opened the trunk.  Ward said to Spohn, "He wants me to test the dope again."  Jennings went back inside briefly.

Ward returned to the porch with a small soda bottle containing what Spohn believed was ammonia or bleach used to test methamphetamine.  Jennings returned to the doorway and Ward said, "Well, get the dope, we'll test it again."  Jennings pulled a .357-magnum from his waistband and pointed it at Ward.  Spohn turned around and asked petitioner, "What the hell is this?  What the hell is going on?"  Petitioner stated he did not know what was going on.

Spohn got out of the car to see what was going on.  He did not think Jennings was going to shoot because he had not yet done so.  When Spohn neared the steps, Jennings pointed the gun at him and asked him if he wanted to die.  Spohn said, "[T]his ain't got to happen," and Jennings racked the gun at Spohn.  Ward threw bleach in Jennings's face and grabbed for the gun.  After a brief struggle, Ward took the gun from Jennings and threw it in the front seat of the car.  Spohn was not sure where petitioner and Blunt were during this time.[7]  Spohn anticipated a fight and shoved Jennings against the door. Jennings punched Spohn and they started to fight.

---

[7] He acknowledged, however, that he reported in his initial statement to law enforcement that petitioner and Blunt were out of the car at this point.

Ward retrieved a Club from the car and returned with it, telling Spohn to watch out.[8]  Ward struck Jennings with the Club on the side of his face or head.  Jennings fell into the house.  Ward said, "Hey, I need my money, I want my money or my dope."  Jennings said, "Fuck you, the dope is no good, you ain't gettin' shit."  The two continued to struggle and conversation continued in this vein until Jennings got up and said he was going to get a gun and kill them.

Jennings charged at them and Ward hit Jennings again, which caused Jennings to go down.  When Jennings got up, he went toward the burglar alarm.  Spohn and Ward pulled him back and Ward said, "What the hell we going to do now?"  Ward may have hit Jennings again.[9]  Jennings had Ward by the collar and yanked him inside and pulled the door shut.  Spohn tried to enter but the door was locked.  Spohn stayed on the porch and looked through the window[10] as Ward and Jennings fist fought inside the office for approximately five minutes.  During the struggle, Jennings appeared to be going for the desk.  Jennings was laughing and screamed that Ward and Spohn would be dead in a matter of days.  Spohn estimated that Ward hit Jennings five to 10 times in total.  Spohn personally saw Ward hit Jennings in the head three times, but the rest of the time the door was closed.

Eventually, Ward opened the door and Spohn saw Jennings on one knee with an injury to his head that was bleeding.  Jennings's hands were taped up and a blanket was

---

[8] Spohn had received the Club from his friend, Christie Wise.  Spohn "threw it in" Ward's car because he did not want it.  He testified that he did not give it to Ward to use as a weapon at Jennings's house.  Wise is also referred to in the record by the first name Kristi and the last name Cribbs.

[9] Spohn acknowledged that he may have reported in his initial statement that Ward kicked Jennings a few times but, at trial, Spohn denied that Ward kicked Jennings.

[10] Spohn acknowledged reporting in his first statement that he went back to the car and then returned to the porch during this time.  However, at trial, he denied returning to the car.

draped over his shoulder and head, but Spohn did not see how that happened. Ward said Jennings was not going to pay the money. Ward went to the car and told petitioner he needed to say something. Petitioner came up to the house and told Jennings he needed to pay the money. Jennings refused. Spohn could see Blunt's shadow still in the car.

Ward reiterated that he wanted his money and petitioner said, "I know he's got it here. I know he's got the money." He also said, "I probably know where the money is at" and "If he ain't going to pay it, I think I know where that money is at." Ward asked where and petitioner said something Spohn could not hear. By this time, Blunt was out of the car. Petitioner went around the side of the house, toward the back of the house and garage. Ward went into the house through the office. Spohn monitored Jennings. At some point, Jennings told Spohn that he could not breathe and did not want to die. Spohn told him not to worry and that he would be alright. Spohn did not think Jennings was injured very badly.

Eventually, Ward returned, rolling a safe.[11] He lifted the safe onto the bumper of the car and flipped it into the trunk. They expected drugs would be in the safe. Blunt stood near the car looking scared. Neither Blunt nor petitioner wore gloves. Ward wore latex gloves. At some point, Ward told Spohn that he went upstairs for a second or two, then went down to the basement to get the safe.

Spohn did not see other property being taken from the house but saw a sword in the trunk. He also later saw a .30-30 rifle being removed from the trunk. At some point, he saw Ward with a portfolio that Ward said contained credit cards. Spohn never saw petitioner touch the Club, get on the porch, go inside the house, or come out with anything from the house.

---

[11] Spohn identified the safe retrieved by law enforcement from the Tule River as appearing to be the same safe.

Ward shut the trunk, Blunt and petitioner got in the car, and Ward told Jennings, "Hey, it didn't have to be like this. If you don't got the money or dope, if it got burnt, just tell me, we can handle it. All I wanted was my money or my dope." They then got in the car and drove off.

When they left, Jennings was on all fours, kneeling with his hands taped together and out in front of him by the front door. Spohn had the Club in his lap. After they had driven a few miles, Spohn threw the Club out the car window onto the side of the road. After their vehicle passed a sheriff's vehicle Ward threw the .357-magnum out of the car. Nearing Porterville, they saw another sheriff's vehicle and got scared. They drove through a field and ended up adjacent to a residential area. Ward asked if Spohn knew anyone in the area and Spohn directed him to Wise's house.

Spohn had sold drugs to Wise for a few months and had attended an education program with her. He had been to her house once or twice. Spohn went into Wise's house and Ward drove the car through a gate and into the backyard. Eventually, Ward, Blunt, and petitioner also came inside. Wise was not home and Spohn paged her with "187," a code with which he usually paged her and which he also understood to be the Penal Code section for murder. Wise did not respond. Spohn paged his friends Sommerset and Young and talked to Sommerset on the phone. By the time he finished this conversation, the safe had been moved into Wise's bedroom and Wise had arrived with Vance O. At some point, the .30-30 rifle and sword were also brought into the house.

Spohn grabbed Wise by the arm and told her he needed to tell her something. He pushed her into the bedroom. Ward and either petitioner or Blunt were also present. Spohn said "I'm in some trouble here for a second." Spohn did not tell Wise much but she was "freaking out," until she eventually calmed down and said it would be alright. Someone shut the bedroom door. Wise had a crowbar and multiple people used it to try to open the safe, including Ward and Sommerset.

11.

Eventually, they opened the safe and found a coin collection inside, along with cuff links, a few lighters, and some other odds and ends. They also found certificates for some of the coins. Ward and petitioner argued about the contents of the safe. They emptied the safe into two plastic bags. At some point, Spohn changed his clothes and shoes because he was worried they might have blood on them. He left his worn clothes and shoes in Wise's bathroom. Ward also changed clothes.

When Spohn came out of the bathroom after changing clothes, additional people had arrived at the house, including Moore. Spohn told Ward they should get out of there. Someone took one of the bags of stolen property and the sword and put them in the trunk of Wise's car. The rifle was left at the house, along with the second bag. Spohn, petitioner, Blunt, and Wise left in Wise's car. Young drove Ward, Sommerset, and Young's girlfriend in Young's car.

The group eventually ended up in Young's garage. The property was dumped out of the bag onto a pool table in the garage. The property included some two-dollar bills; silver certificates; an envelope, rolls, baggies, and books of coins, including buffalo nickels, silver coins, liberty 50-cent pieces, and old dimes; cuff links; lighters; and sports trading cards. Ward said, "This could be worth a million dollars. It's worthless to me. I need my money or dope, not a fucking coin collection." Ward, Sommerset, Wise, and Young took what they wanted from the property on the pool table. Spohn took some coin books and cuff links, but he later gave them away. Spohn did not see petitioner or Blunt take any property. Someone loaded up the rest of the property and took it with them. Spohn did not see any property left behind on the pool table.

Eventually, Moore picked Ward up at Young's house. Petitioner also left Young's house at some point. Spohn and Young took Blunt and dropped him off at an overpass. Spohn went home.

A day or so later, Spohn and Ward learned that Jennings had died. Around the same time, Spohn saw Ward and Moore with Jennings's credit cards and Moore was

12.

using them at a store.  He did not know where Moore got the cards.  The cards had not been dumped out on the pool table.  At some point, he also saw the credit cards in Ward's car.  Spohn told Ward, "If you guys use those credit cards you're through."

After a "couple weeks," Spohn saw detectives at his neighbor's house and the neighbor told Spohn they were looking for him in relation to a murder in Strathmore.  Spohn then fled to Arkansas, where he ran into Ward.  Soon thereafter, while still in Arkansas, Spohn was arrested.

## V.      Spohn's Out-of-court Statements

At trial, Spohn acknowledged additional inconsistencies between his trial testimony and his statement to law enforcement in Arkansas.  In Arkansas, Spohn may have reported that he and Ward picked up petitioner and Blunt at a house, rather than a bar.  Spohn told investigators that Ward had backed into Jennings's driveway, rather than pulling in "head in."

In his Arkansas statement, Spohn did not mention drugs or a drug deal.  Rather, he reported he was told they were collecting on a gambling debt.  It appeared to Spohn that Jennings did not know who they were and had no idea why there were at his house.  Once Spohn saw the fight between Ward and Jennings, he assumed it was a "heist" and Jennings did not owe any money.  He did not tell law enforcement that Jennings had a gun.  Once the fighting started, he looked back and saw that petitioner and Blunt had gotten out of the car.  He reported that Jennings stated several times that he did not want to die and pleaded with them to stop hitting him and take what they wanted.  He described the beating as "a sick scene."  He stated Ward kept striking Jennings because Jennings kept trying to get up.

Although Spohn testified at trial that Blunt did not participate in the beating or taking of property from the house, he reported in Arkansas that Blunt was out of his sight for a time, Blunt and petitioner rolled Jennings's safe up the stairs and out of the basement, and Blunt exited the house with a bag of property and a pistol.  He reported

13.

that both Blunt and petitioner wore work gloves. However, Ward did not wear gloves and therefore washed things up. Spohn also stated that he had wanted to call an ambulance but "they" said "nah, no, just get the fuck out of here."

In his Arkansas statement, Spohn also reported that it was Blunt who threw the Club and Jennings's handgun out of the car. Spohn reported that petitioner, Blunt, and Ward worked on opening the safe at Wise's house. Additionally, Blunt brought a bag and the sword into Wise's house. Petitioner was in charge of dividing up the property at Young's house.

In Arkansas, Spohn reported that he and Ward had a conversation about methamphetamine being found in Jennings's orchard and Ward denied having any knowledge of any methamphetamine.

Spohn wrote letters to Wise while in custody. In one letter, he stated, "I'm not going down for [petitioner's] evil scheme, you know, him and [Ward] put all this together, I found that out later on." He clarified that the "evil scheme" he was referring to was a bad drug deal.

## VI. Wise's Testimony

Wise testified pursuant to a plea agreement. As a result of aid Wise provided Spohn after the murder, she was charged with and pled guilty to a felony. Another felony charge was dropped and the judge indicated her testimony was to be considered at sentencing.

Wise identified Spohn as a friend she had known for about six months, and testified she knew Ward for two or three months prior to the murder. Petitioner was married to Wise's aunt for three days at one point, but Wise did not know him personally prior to the incident. She had never met Blunt before.

Wise testified she had given Spohn a Club a few months before the murder, after her car was broken into while Spohn was using it.

14.

When Wise came home on February 5, 1998, Spohn, Ward, Blunt, and petitioner were at her house. Ward had a cut on his head. Blunt was in the bedroom trying to pry open the safe with a crowbar, petitioner was sitting in the living room with a black bag between his legs, and Spohn and Ward were at the side door near the carport. Ward was wearing Wise's sweatpants and shirt. Spohn told Wise he needed to talk to her, so she went into the bedroom with Spohn and Ward. Ward proceeded to help Blunt with the safe. Ward told Wise they had been in a fight and the police were chasing them. Sommerset came into the room and then left again. The safe was opened and Ward and Blunt took the contents in two or three bags while Spohn talked to Wise. Petitioner remained in the living room. Ward and Blunt carried the bags and loaded them into Wise's car. They may have also loaded some things into Young's car. Sommerset and Ward got into Young's car while Spohn, Blunt, and petitioner got into Wise's car with Wise. Blunt and petitioner told her there was a .30-30 rifle in her room and she could have it for her troubles. Ward told her there was a bag of bloody clothes on her back porch and she should burn them.

The group drove to Young's house. Wise opened her trunk and Spohn picked up a sword and went and hid it on the side of the house. Petitioner and Blunt each grabbed a bag and everyone went into the garage. The bags were emptied onto the pool table by the time Wise walked in and everyone was standing around, with Ward, Spohn, Blunt, and petitioner picking through the contents. Among the contents, Wise saw coin books, sports cards, watches, lighters, a passport, and items that appeared to be candlesticks. Ward took the two-dollar bills and credit cards and said the others could have the rest. Petitioner and Blunt took a bag of items, including coin books, to divide between them later. Spohn also filled a bag with coin books and other things. Petitioner or Blunt also mentioned that a bag may have been left at Wise's house. Wise called Vance and told him to put the bag away. Blunt told her he would go to her house the next day for the bag and a handgun registered to himself that he left in Wise's neighbor's yard. Wise left

15.

shortly thereafter with Sommerset. One person left walking but she could not recall who. Everyone else was still at Young's house when she left.

On her way home, Wise and Sommerset tried unsuccessfully to locate guns that petitioner, Blunt and Spohn told her were thrown from the car. She was later given more specific information regarding the location of the guns and attempted to search for them again without success.

When Wise arrived home, the safe was still there. The .30-30 rifle was under her bed. About an hour later, Vance, Sommerset and another individual removed the safe from the house in Wise's vehicle. Vance unloaded the rifle and put it up on the wall. Wise told Sommerset to get rid of it and he took it out of the house. Wise did not see the rifle again.

Wise left her house for a few hours and, when she returned, her fence was down and a "strange guy," later identified as Moore, was fixing it. Ward's car was in the backyard and Ward was there eating. Ward asked whether Wise had located the guns that were thrown from the car and she told him she had not. Blunt came by and asked about the bag that was left at the house.

Soon after the incident, Wise saw Ward use Jennings's credit card at a gas station. Ward also told her he used the credit cards at a casino.

Wise could not recall whether Spohn had told her that petitioner and Blunt were taking property out of Jennings's house the entire time that Ward and Spohn were fighting with Jennings but she admitted that she told a detective that Spohn had so stated. She could not recall telling a detective that Ward had "busted" knuckles on both hands, but if she made such statement, it was true to the best of her recollection. Wise testified that Spohn told her he wore gloves during the incident. Although Spohn generally spoke freely with Wise about selling drugs, he told her the debt they attempted to collect from Jennings was for back pay owed to petitioner. Ward told Wise that "he did a burglary and a guy got beat up." Petitioner told Wise that he threw a gun out of the car. Wise

16.

acknowledged giving multiple false statements to law enforcement regarding the events following the incident.

## VII.   Moore's Testimony

Moore also testified pursuant to a plea agreement.  Moore testified he had been convicted of five prior felonies in California, as well as additional felonies out of state, and he anticipated his testimony would result in a reduced sentence relating to a then-ongoing prosecution for possession of methamphetamine unrelated to the instant case. Moore otherwise was subject to a life sentence under the Three Strikes law but made a deal with the prosecution that he would testify in exchange for being allowed to plead guilty to a single felony and to be sentenced as a second-striker.  When entering his plea, he stated he understood that "the more I help [the prosecution,] the better it helps me." At the time of trial, he had not been charged with any crimes relating to the instant case.

Moore picked up Ward at a house at 6:00 a.m. on February 6, 1998, and drove him to a house where they saw Blunt, who told them petitioner was asleep upstairs.  Moore then drove Ward to Wise's house to pick up Ward's car.  Ward brought the car out of Wise's backyard while Moore started repairing Wise's fence.  While there, Moore heard Blunt and Ward ask Wise about a bag of stuff.  Wise did not know what happened to the bag.  Ward was mad about the missing bag but Blunt said it did not matter to him. Moore, Ward, and Blunt all left Wise's house, each driving their own vehicles.  They proceeded together to a gas station where Ward used Jennings's credit card to fill up his own vehicle, and then handed the pump to Moore and Blunt who filled up their vehicles.

Two or three days later, Ward and Moore went shopping using Jennings's credit cards.  They visited numerous stores, where Ward and Moore picked out what they wanted and Ward purchased the items at the register by signing Jennings's name.  There were four or five credit cards in total.  On a later date, Moore, Spohn, Ward, and others later used one of Jennings's credit cards to pay for a meal at a casino and unsuccessfully

17.

attempted to get a cash advance. On the way to the casino, they used silver quarters provided by Ward to buy items from a vending machine.

On a still later date, Moore had an accident in which he wrecked, and then abandoned, Ward's vehicle. When Ward and Moore found out the car had been impounded, Moore went to the storage yard and retrieved a booklet of silver dollars. The silver dollars were from "the 1800s, mostly." Moore told a man at the impound yard that the coins belonged to his grandfather and had sentimental value. The next day, Ward paid to have the vehicle released.

## VIII. Defense Case

Ward testified at trial. At the time of the murder, he had known Spohn for about four months and petitioner for approximately one month. He met Blunt for the first time the night before the incident.

Three or four days prior to the murder, petitioner told Ward that his friend wanted some methamphetamine. Ward sold drugs for a living and earned approximately $15,000 per month. Ward obtained the drugs for petitioner's deal from someone who fronted them to him. The day before the murder, Ward met up with petitioner to deliver five pounds of methamphetamine to Jennings. Jennings looked at the drugs but did not ask Ward to test them. Jennings gave Ward $10,000, half of the sale price, with the agreement to pay the remainder the following morning.

The next morning, Ward paged Spohn to bring him his car at the motel where Ward was staying. After spending some time with Spohn, Ward took Spohn home briefly before returning to pick him up. At that point, Ward asked Spohn to ride with him to pick up some money and they went looking for petitioner. Ward did not know how to get to Jennings's property without petitioner's help. By this point, it was past the time Ward was scheduled to return to Jennings's home for the rest of the money. Around 3:00 or 4:00 p.m., they found petitioner and Blunt at a bar. Ward and Spohn followed petitioner and Blunt to drop off Blunt's truck and the four then rode together to

18.

Jennings's property. Ward went with the intention to collect his money and did not intend to kill or rob Jennings.

Ward pulled straight into Jennings's driveway. Jennings came just outside the office doorway and Ward got out of the car to talk to him. Ward left the car running with the lights on. Jennings was upset that Ward was late and Ward told him he had trouble locating petitioner to give him directions. Jennings "was cussing about [petitioner] a little bit." Ward asked for the money and Jennings told him there was a problem with the drugs and he needed to test them. He was concerned that two of the one-pound packages were a different color than the other three.

Ward returned to his car to get from his trunk the soda bottle containing ammonia to test the drugs. He turned off the car and the lights and told Spohn that Jennings wanted to test the drugs, which would take about 30 minutes. Jennings was worried about who else was in the car, but Ward refused to tell him the names of anyone other than petitioner. As Ward returned to the porch, Jennings backed up against the door frame, pulled out a gun, pointed it at Ward, and asked Ward if he wanted to die. Ward put his hands up and said this did not have to happen. Jennings said the drugs were "no good." Jennings again threatened to kill Ward and looked toward the car. As he did so, Ward squirted the "stuff" from the soda bottle in Jennings's face and chest. Ward tried to get the gun away from Jennings and the two men struggled.

Ward yelled for help and Spohn came running up with the Club. Spohn swung the Club, trying to hit Jennings. Ward was not sure if Spohn was successful. Ward and Jennings ended up falling or stumbling into the office. At some point, Spohn hit Ward in the head with the Club. Ward did not feel the blow but woke up on the floor. Ward then saw Spohn hitting Jennings four or five times with the Club. The gun had come loose from Jennings's hand and was under Ward's body. Spohn stopped hitting Jennings and Ward picked up the gun and took it outside where he put it under the front seat of his car. Ward testified that the gun was a Ruger .357.

19.

While Ward was away Spohn and Jennings got into a scuffle and Spohn ended up with blood all over his sweater. Petitioner wanted to know what was going on and Ward went to find out. Ward went back into the house and confronted Jennings. Jennings again said the drugs were "no good" and threatened to kill Ward. Ward asked Jennings to give him the money or return the drugs. Jennings would only say, "Fuck you." At some point, Spohn walked to the office door. Jennings shoved Spohn out, pulled Ward back inside, and shut the door. They wrestled for about three minutes. Jennings tried to get to one of the drawers in his desk. Ward got free and opened the door to let Spohn back in with the Club.

Ward went back to the car. Petitioner was freaking out. Ward told petitioner to talk to Jennings and petitioner complied. Ward remained in the car and could not hear the discussion. Petitioner returned and told Ward that Jennings was not going to pay, but petitioner knew where the money was. Petitioner left for another three to four minutes before returning and telling Ward he needed his help. Ward walked with petitioner to the back door, then down to the basement where they found Jennings's safe. They rolled the safe out through the kitchen, across the back patio, and out to the car, where Ward loaded it into the trunk. The only other thing they took from the house was a .30-30 rifle they found leaning against the back door. Ward denied opening drawers and cupboards throughout Jennings's house.

While Ward was loading the safe into the car, Spohn was standing with Jennings. Ward saw duct tape on Jennings's hands and feet but did not put it there himself. The duct tape must have come from inside the house because Spohn never went back to the car. Ward said they should leave but Spohn refused. Spohn was "really pumped up, really excited." Spohn was concerned that Jennings would call the police once they left. Ward asked someone to pull the phone lines and either petitioner or Blunt did so. They left Jennings on his hands and knees in the office, with a rug over his head, yelling at them.

20.

About a mile from the house, they encountered a sheriff's deputy at a four-way stop who put a spotlight on them, and they sped off. Spohn threw the Club out of the car. About a mile further along, they saw a highway patrol officer and after that, Ward threw the .357-Ruger firearm he had taken away from Jennings out of the car.

On Spohn's suggestion, the group went to Wise's house, where Ward took off the fence in order to pull his car into her backyard. The safe was taken into Wise's bedroom where Ward helped open it. Inside, he found a coin collection, passports and sports cards. The items from the safe were put into one trash bag and put into Wise's car. At Young's house, the items were poured out onto the pool table. Ward took two passports and the credit cards. A couple of days later, Ward obtained some coins from Spohn and gave them to Moore. He also gave the passports to Moore. Ward used Jennings's gas credit card four times. He was with Moore when Moore used Jennings's credit cards approximately eight times at various department stores. Ward kept some of the property Moore purchased with the credit cards. Ward also was with Moore at the casino, but Ward did not know that Moore used Jennings's credit card to pay for his meal until the time of trial.

Weeks after the incident, Ward found out that Jennings had died and he was surprised.

Ward denied telling Wise that he had done a burglary and a guy got beat up. He denied telling Moore that Blunt and petitioner took property from the house while Ward confronted Jennings.

An attorney testifying as a defense expert opined that the marijuana in Jennings's house was being cultivated for sale, and that it was common for marijuana growers to sell methamphetamine. However, he conceded there was no physical evidence of sales of marijuana or methamphetamine at Jennings's home.

## PROCEDURAL HISTORY

"In 1998, an information was filed alleging petitioner, along with codefendants Larry Ward, Randy Spohn, and Daniel Blunt, committed the following offenses against Jennings: murder (§ 187, subd. (a); count 1), robbery (§ 211; count 2), burglary (§ 459; count 3), and receiving stolen property (§ 496, subd. (a); count 4). As to count 1, the information alleged the special circumstances that the murder was committed during the commission of a robbery and burglary. (§ 190.2, subd. (a)(17)(A), (G).) As to petitioner and Blunt only, the information also alleged prior conviction allegations.[12] (*People v. Ward* (Oct. 22, 2002, F035608) [nonpub. opn.] (*Ward*).)

"During trial, petitioner pled no contest to receiving stolen property. The robbery count against him was dismissed. A jury found petitioner guilty of first degree murder and burglary, and found both special circumstances to be true. During the penalty phase, the jury selected life without the possibility of parole as the appropriate penalty. Petitioner was sentenced on count 3 to the upper term of six years, and on count 1 to a consecutive term of life without the possibility of parole. On appeal, we affirmed.[13] (*Ward*, *supra*, F035608.)" (*Potts*, *supra*, F081141.)

On February 21, 2019, petitioner filed a petition for resentencing pursuant to section 1172.6. Counsel was appointed to represent him. Following briefing and a

---

[12] "As to Ward and Spohn only, the information also alleged weapon use and great bodily injury enhancements. (§§ 12022, subd. (b), 12022.7.)"

[13] "Spohn pled guilty to second degree murder prior to trial. Blunt pled no contest to receiving stolen property along with [petitioner], and the court dismissed this count as to Ward. The court also dismissed the robbery count as to Blunt. The jury found Blunt and Ward guilty on all remaining counts and allegations. Ward was sentenced on the robbery count and related enhancements to a term of 13 years, and on the murder count to a term of life without the possibility of parole. The trial court struck the special circumstance as to Blunt and sentenced him to a term of 25 years to life for murder, a concurrent four-year term for burglary, and a concurrent two-year term for possession of stolen property. On appeal, we directed a corrected abstract of judgment be prepared for Blunt, but otherwise affirmed. (*Ward*, *supra*, F035608.)"

hearing, the court denied the petition at the prima facie stage. On appeal, we reversed and remanded with directions to issue an order to show cause and, to the extent necessary, hold an evidentiary hearing pursuant to section 1172.6, subdivision (d). (*Potts*, *supra*, F081141.)

Following further briefing on remand, the trial court heard the matter on March 17, 2023. Based on the trial evidence, the court found petitioner "was a direct perpetrator and/or intended to aid and abet the burglary and robbery before the victim was killed, and was a major participant in the crimes who acted with reckless disregard to human life." Accordingly, the court found petitioner "guilty beyond a reasonable doubt of murder and the special circumstances alleged." On that basis, the petition was denied.

## DISCUSSION

### I.     Applicable Law Regarding Section 1172.6

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted,

23.

counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."**14** (§ 189, subd. (e); accord, *Gentile*, *supra*, 10 Cal.5th at p. 842.) Finally, the bill added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, *supra*, 10 Cal.5th at p. 843.)

Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The

---

**14** Additionally, subdivision (f) of section 189 permits felony-murder liability under specified circumstances where the victim is a peace officer.

24.

prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

## II.     Sufficient Evidence of Felony-murder Liability

The trial court found petitioner was ineligible for resentencing because the prosecution had proved beyond a reasonable doubt that he was guilty of murder as a major participant in a qualifying felony who acted with reckless indifference to human life. Petitioner contends these findings are not supported by substantial evidence. We disagree.

### A.     Applicable Law Regarding Felony Murder

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Relatedly, section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court sought to clarify the circumstances under which "an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.)  The high court identified the following nonexhaustive factors as relevant to this inquiry:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)  However, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

The following year, in *People v. Clark* (2016) 63 Cal.4th 522, 614–623 (*Clark*), the high court addressed the "reckless indifference" standard.  The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.)  The court further explained that reckless indifference to human life has both a subjective and an objective component. (*Ibid.*)  Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.)  Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.)  The fact that a felony

26.

involves a gun is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617–618.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims, (4) the defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Notably, *Banks* and *Clark* derived their holdings from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the prevailing Eighth Amendment jurisprudence regarding the circumstances under which the death penalty permissibly may be imposed for felony murder. (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393.) Our Supreme Court has explained that *Enmund* and *Tison* together establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and had no culpable mental state at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) We briefly describe the facts of *Enmund* and *Tison* to give context to this spectrum.

The defendant in *Enmund* was a getaway driver for a robbery. He sat waiting in his parked car a few hundred feet away from the home where his two confederates fatally shot an elderly couple when they resisted. (*Enmund*, *supra*, 458 U.S. at p. 784.) The high court emphasized the defendant "did not kill or attempt to kill," and the record did not support a finding he had "any intention of participating in or facilitating a murder."

(*Enmund*, at p. 798.)  As such, imposition of the death penalty, which must be based solely on a defendant's own culpability, was constitutionally disproportionate.  (*Ibid*.)

The facts of *Tison* are starkly different.  There, two brothers helped their father and his cellmate—both convicted murderers—escape from prison, arming the prisoners during their escape.  (*Tison*, *supra*, 481 U.S. at pp. 139, 150–152.)  When the group eventually experienced car trouble, one of the brothers flagged down a passing car for help while the other men laid in wait by the side of the road.  (*Id.* at pp. 139–140.)  The group then kidnapped at gunpoint a family of four in the passing car, robbed them, and drove them into the desert.  (*Id.* at p. 140.)  The brothers stood by while their father and his cellmate shot the victims repeatedly.  The group then left the family to die in the desert and drove off in the family's car.  (*Id.* at pp. 139–141.)  The high court emphasized that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."  (*Id.* at pp. 157–158.)  The high court noted the brothers' substantial and active participation in the kidnapping and robbery implicated them in the resulting deaths, and the death penalty could properly be imposed under such circumstances where the defendants also exhibited reckless indifference to human life.  (*Id.* at p. 158.)

Our Supreme Court has explained that, "[s]omewhere between [*Tison* and *Enmund*], at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility."  (*Banks*, *supra*, 61 Cal.4th at p. 802.)

## B.     Major Participation

Substantial evidence supports a finding that petitioner was a major participant in the underlying burglary that led to Jennings's death.

First, substantial evidence supported a finding that petitioner had a major role in planning the burglary. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Testimony established that petitioner had a long-standing interest in accessing Jennings's safe and knowledge of its location. Petitioner also directed the perpetrators to Jennings's residence. He wore work gloves in the house, indicating he came prepared to avoid leaving fingerprints. Furthermore, although Spohn testified that the perpetrators went to Jennings's home to collect on a drug debt, other evidence suggested this was not the case. Spohn initially reported to law enforcement that he quickly realized the perpetrators were not there to collect on a debt, Jennings did not know who they were, and it was a "heist." Additionally, when petitioner first met Spohn, petitioner stated, "We'll need him, he's going to know me," suggesting that petitioner's intent was to take Jennings by surprise, rather than to collect on a drug deal petitioner had helped organize. There was no physical evidence to support a theory that the crime resulted from a drug deal on which Jennings reneged. The court, as trier of fact, was free to credit evidence suggesting the perpetrators intended to commit burglary over testimony suggesting the perpetrators were merely collecting on a debt. Taken together, the evidence supports a finding that petitioner played a significant role in planning the burglary.

We acknowledge that petitioner does not appear to have supplied or used the murder weapon. Furthermore, the evidence does not suggest petitioner had any prior knowledge of his co-perpetrators' inclination toward lethal violence or awareness of any particular dangers posed by the nature of the crime. However, the lack of such evidence is countervailed by evidence regarding the duration of the offense, at which petitioner was present, and at which he had ample opportunity to intervene but declined to do so. Moreover, the evidence suggests that, once lethal force was used, petitioner entered the

house to seize Jennings's belongings. He then remained with the co-perpetrators into the next morning as they travelled around the county to dispose of evidence and divide the items stolen from Jennings's house. His conduct following the murder reflects no disapproval or disavowal of his co-perpetrators' actions.

The foregoing substantial evidence is sufficient to support the court's finding that petitioner was a major participant in the underlying felonies.

## C.    Reckless Indifference

There is substantial overlap between the evidence supporting the court's major participation finding and its reckless indifference finding. We again acknowledge the evidence does not support a finding petitioner had prior knowledge of any weapons used in the offense or his co-perpetrators' likelihood of killing. However, petitioner was physically present during the crime, which involved a prolonged scuffle that Spohn described to law enforcement as a "sick scene." Ward inflicted multiple blows to Jennings's head and body while petitioner stood or sat by and made no efforts to minimize the violence. Instead, petitioner seemingly viewed the beating as an opportunity to enter the home to remove the safe.[15] Petitioner's conduct also suggests the extreme violence perpetrated against Jennings was unsurprising to petitioner. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593.)

We reject petitioner's contention that Jennings's restraint – which petitioner characterizes as lasting approximately 10 minutes – was not so prolonged as to provide a substantial window of opportunity for violence nor a sufficient opportunity for petitioner to intervene. (See *Clark*, *supra*, 63 Cal.4th at p. 620 ["Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged

---

[15] On this basis, the cases cited by petitioner, which involve defendants who were not close enough to the scene to prevent or restrain the use of force, are distinguishable. (*Scoggins*, *supra*, 9 Cal.5th at p. 675; *In re Ramirez*, *supra*, 32 Cal.App.5th at pp. 404–405.)

periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder."].)  First, the testimony cited by petitioner does not support any estimation of the duration of the offense.  Moreover, Spohn's testimony suggests Jennings was restrained for longer than 10 minutes.  Spohn testified that Ward and Jennings struggled for the gun for a few minutes.  The fighting which occurred while Ward and Jennings were locked in the office together lasted approximately five minutes.  Ward spent another approximately five to 10 minutes inside the house.  The group left the house five to 10 minutes after an encounter in which Ward hit Jennings and Jennings said he did not want to die.  Spohn estimated that the entire incident lasted approximately 45 minutes, including a 15- to 25-minute drive to Wise's house.  However, he also acknowledged that he could not accurately estimate time due to his mental state following the incident.

Regardless, Jennings was restrained at least long enough for the perpetrators to enter the home and drag the safe up the basement stairs and across the home and into the driveway, before tipping it into the trunk of the car.  He remained restrained while someone cut the phone lines prior to the perpetrators' departure.  Although Jennings had expressed difficulty breathing, he was left with his hands taped together and his phone lines cut, thus limiting his ability to seek aid once the perpetrators were gone.  Petitioner's participation in these events manifestly evidences his reckless indifference to Jennings's life.

The cases cited by petitioner are not to the contrary.  In *Scoggins*, *supra*, 9 Cal.5th at page 681, the high court held that an interaction that lasted between a few seconds and three to five minutes did not involve a prolonged period of restraint that supported finding of reckless indifference.  In *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 (*Bennett*), the court held that a time lapse of "minutes" was negligible and did not support a finding of reckless indifference.  Neither involved a prolonged period of restraint similar to that at issue here.

Furthermore, we reject petitioner's suggestion that the *Bennett* court characterized a 24- to 34-minute period of restraint as "negligible." The *Bennett* court explained that the victim left his apartment "around 11:00 p.m." A few minutes later, two of the perpetrators left a parking lot and walked across the street and into the victim's apartment complex. (*Bennett*, *supra*, 26 Cal.App.5th at p. 1008.) Witnesses then saw the perpetrators chasing the victim and shooting at him. Several witnesses called 911. (*Id*. at p. 1009.) The police arrived at either 11:24 p.m. or 11:34 p.m., the last 911 call having come in three minutes earlier.[16] (*Bennett*, at pp. 1009, 1024, fn. 8.) Thus, the robbery took place sometime in the interval between "a few minutes" after "around 11:00 p.m.," and the 911 call at approximately 11:21 p.m. or 11:31 p.m. The court's recitation of facts, which describes the victim running from the perpetrators until he was gunned down, does not suggest the victim was restrained at all, let alone for 24 to 34 minutes. Furthermore, the witnesses called 911 as they saw the chase and the shooting, and the police arrived a mere three minutes later. Likewise, the appellate court, which referred to videotape from the parking lot where the perpetrators parked, stated the time lapse between the perpetrators leaving the parking lot and subsequently returning after committing the offense was "minutes." (*Id*. at p. 1024.) Thus, *Bennett* is distinguishable from the instant case on its facts.

In sum, substantial evidence supports the court's finding that petitioner acted with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

---

[16] The body of the opinion states that police arrived at 11:24 p.m., while a footnote states police arrived at 11:34 p.m. (*Bennett*, *supra*, 26 Cal.App.5th at p. 1009; see *id.* at p. 1024, fn. 8.) This difference, while significant, does not alter our analysis.

## **DISPOSITION**

The March 17, 2023 order denying the petition is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

SNAUFFER, J.

33.